IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICOLE MCDANIELS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 15-2803 |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| Defendant. | : | |

MEMORANDUM OPINION

RUFE, J.                                                                                    FEBRUARY 13, 2017

Before the Court is Defendant City of Philadelphia's Motion for Summary Judgment. For the reasons that follow, the motion is denied, as there are factual disputes regarding nearly every element of Plaintiff's claim, and Defendant has failed to put forward any compelling evidence or argument that it is entitled to judgment as a matter of law.

## I.    BACKGROUND

This case concerns the shooting death of Aaron Lamar McDaniels by Jermias Olivo, a Philadelphia Police Officer with a checkered past.[1]  The parties have stipulated to some of the following facts, although others remain in dispute.[2]

### A.  The August 20 Shooting of Mr. McDaniels

The parties agree that on the evening of August 20, 2013, Officer Olivo and his partner, Officer Camarote, were in uniform and driving a marked patrol car when they attempted to stop a Buick for disregarding a stop sign.[3]  Mr. McDaniels was riding in the front passenger seat and

---

[1] Plaintiff Nicole McDaniels brings this case as the administrator of Mr. McDaniels's estate.

[2] Doc. No. 16-1 (Defendant's Statement of Stipulated Material Facts).

[3] *Id.* ¶ 1.

Kareem Gordon was driving.[4]  The Buick initially stopped, but sped off when the officers exited

their patrol car.[5]  The officers returned to their vehicle and a brief chase ensued, which ended

when the Buick struck a minivan at the intersection of 22nd Street and Glenwood Avenue and

came to rest on a nearby sidewalk.[6]  Mr. Gordon fled the scene on foot while Mr. McDaniels

remained in the car.[7]  Officer Camarote split off to chase after Mr. Gordon while Officer Olivo

approached the passenger side of the Buick.[8]

The parties dispute what happened next.  Plaintiff alleges based on independent

eyewitness testimony that Officer Olivo approached the Buick with his gun drawn, opened the

door, and yelled "get out, get out."[9]  Mr. McDaniels, who was unarmed, remained seated and

turned toward Officer Olivo.[10]  Officer Olivo "then just started shooting," paused briefly when

Mr. McDaniels appeared to lean over, and resumed firing.[11]  Plaintiff offers the opinions of two

experts that Mr. McDaniels was unarmed at the time of the shooting, although a gun was later

recovered from the car.[12]

Officer Olivo provided a different account of the shooting, and testified that as he

approached the Buick, Mr. McDaniels opened the door and pointed a gun at him.[13]  Officer

Olivo claims that he instructed Mr. McDaniels to drop the weapon and then fired two shots when

---

[4] *Id.* ¶ 2.

[5] *Id.* ¶ 3.

[6] *Id.* ¶¶ 4-5.

[7] *Id.* ¶ 6.

[8] *Id.* ¶¶ 6-7.

[9] Doc. No. 17-2, Ex. B (Deposition of Tahir Lamar) at 25:7-13.

[10] *Id.*

[11] *Id.* at 25:14-16.

[12] *See* Doc. No. 17-3, Ex. C (Expert Report of Dr. Charles Wetli, MD); Doc. No. 18-1, Ex. E (Expert Report of Dr. Albert B. Harper).

[13] Doc. No. 17-1, Ex. A (Deposition of Jermias Olivo) at 30:8-38:13.

Mr. McDaniels failed to do so.[14]  In response, Mr. McDaniels raised his weapon again, and

Officer Olivo fired several more rounds until the gun fell from his hands.[15]

### B. The Philadelphia Police Department's ("PPD's") Use-of-Force Policies and Training Practices

Mr. McDaniels's death came during a rise in shootings by PPD officers between 2007

and 2014 despite an overall downward trend in violent crime during the same period.[16]  In

August 2013, then-Police Commissioner Charles Ramsey asked the United States Department of

Justice ("DOJ") to provide technical assistance to the PPD, including an evaluation of its use-of-

force policies.[17]  The resulting report, *An Assessment of Deadly Force in the Philadelphia Police

Department*, was issued in 2015 and identified numerous deficiencies in PPD's use-of-force

policies, training programs, and investigative procedures.

The DOJ Report found that PPD officers did not "receive regular, consistent training on

the department's deadly force policy," and were not provided sufficient alternatives to the use of

deadly force.[18]  For example, officers lacked de-escalation training, which can reduce the

likelihood that officers will resort to deadly force.[19]  PPD also did not provide officers with

comprehensive training covering a wide variety of scenarios, including foot pursuits in high-

---

[14] *Id.* at 36:18-37:19.

[15] *Id.* at 37:6-41:12.

[16] Doc. No. 17 (Plaintiff's Response to Defendant's Motion for Summary Judgment) at 5; Ex. J (U.S. DEP'T OF JUSTICE, COLLABORATIVE REFORM INITIATIVE:  AN ASSESSMENT OF DEADLY FORCE IN THE PHILADELPHIA POLICE DEPARTMENT (2015)) ("DOJ Report") at 2, 10-11.  Defendant has not stipulated to these facts, but does not dispute that they must be viewed in the light most favorable to Plaintiff for the purposes of this summary judgment motion. Doc. No. 25 (Defendant's Reply Memorandum in Support of Motion for Summary Judgment) at 1.

[17] DOJ Report at 1.

[18] *Id.* at 40-42.

[19] *Id.* at 69-70.

crime areas.[20]  This lack of training contributed to threat perception failures by officers in the field, such as mistakenly believing that an unarmed person was carrying a weapon.[21]

The DOJ also found PPD's use-of-force policies fragmented and confusing.[22]  In particular, PPD Directive 10, which governed the use of deadly force at the time of Mr. McDaniels's shooting, was poorly worded and incorrectly led officers to believe they could employ deadly force whenever they feared for their life.[23]  However, this was inconsistent with the Directive's intent and controlling Supreme Court precedent, both of which limit the use of deadly force to situations in which it is objectively reasonable.[24]  As a result, PPD officers were sent into the field without a clear understanding of when the use of deadly force was permissible under PPD policy or federal law.

The DOJ's conclusions were consistent with those reached by Plaintiff's proffered expert on police practices, Dr. R. Paul McCauley.  Dr. McCauley undertook a review of PPD deadly force incidents over a 15-year period, and found that PPD officers received inadequate training and lacked clear guidance regarding when the use of deadly force was appropriate.[25]  Dr. McCauley determined that due to a lack of training, PPD officers engaged in dangerous tactics such as "partner splitting"—in which two partners split up to pursue different suspects—which can heighten the risk that an officer will fear for his or her life and resort to deadly force

---

[20] *Id.* at 83-84.

[21] *Id.*

[22] *Id.* at 40-43.

[23] *Id.* at 43-45.

[24] *Id.*; *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citations omitted).

[25] Doc. No. 19-1, Ex. H (McCauley Report).

unnecessarily.[26] Dr. McCauley concluded that PPD's "longstanding practice and custom" of failing to train officers caused Officer Olivo to resort unnecessarily to the use of deadly force against Mr. McDaniels.[27]

### C.  PPD's Disciplinary System

Plaintiff has put forward evidence that the problems at PPD extended to its disciplinary system as well.  A 2003 report by PPD's Integrity and Accountability Office ("IAO") found that investigations by PPD's Internal Affairs Division ("IAD") suffered from excessive and chronic delays, a haphazard penalty system, inadequate follow-up efforts, and a pervasive failure to discipline officers who had violated PPD policies or engaged in severe misconduct.[28]  The IAO Report also found that "the conditions necessary for meaningful and lasting reforms" did not exist because PPD leadership generally tolerated misconduct and an "inherent fraternity" existed between officers and the IAD personnel charged with disciplining them.[29]

Dr. McCauley conducted an audit of IAD investigations and concluded that similar problems still plagued PPD's disciplinary system at the time of Mr. McDaniels's death. Specifically, Dr. McCauley found that IAD investigations frequently were untimely and incomplete, and often failed to account for flawed threat perception or poor tactical decisions when investigating a shooting by an officer.[30]  In addition, because disciplinary proceedings only focused on the shooting in question and did not take into account an officer's previous misconduct—including past shootings—they did not adequately penalize officers for repeated

---

[26] *Id.* at 15-17.

[27] *Id.* at 44-45.

[28] Doc. No. 23-1, Ex. L (Phila. Police Dep't Integrity and Accountability Office:  Disciplinary System (2003)) ("IAO Report") at 1-3, 14-19.

[29] *Id.* at 4.

[30] McCauley Report at 15, 34.

violations of PPD policy, even though repeated shootings are exceedingly rare and thus a strong red flag that an officer may need additional training or monitoring.[31] Dr. McCauley also found that PPD lacked an effective early warning system to identify and track problem officers, making repeated violations of PPD policy more likely.[32]

Dr. McCauley determined that PPD's disciplinary system failed to identify Officer Olivo as a problem officer and take appropriate disciplinary measures despite numerous red flags. Before he shot Mr. McDaniels, Officer Olivo had amassed a staggering record of complaints, including two other shootings, an illegal search, physical and verbal abuse, witness intimidation, domestic assault, and steroid abuse.[33] Dr. McCauley found that PPD did not meaningfully investigate these incidents and took no remedial actions in the wake of the two prior shootings despite evidence that Officer Olivo had made improper decisions regarding the use of force in both situations.[34] Moreover, none of these prior incidents were taken into account during PPD's review of Mr. McDaniels's death, and Officer Olivo was ultimately cleared of any wrongdoing in that investigation.[35] Dr. McCauley concluded that Mr. McDaniels's death could have been avoided if PPD had intervened and taken remedial action after receiving the previous complaints against Officer Olivo.[36]

---

[31] McCauley Report at 17.  In fact, only approximately 3% of PPD officers have been involved in three firearm discharges, as Officer Olivo was.  *Id.* at 16-17.

[32] *Id.* at 16.

[33] *Id.* at 12-13.  These incidents all appear in Officer Olivo's "Concise Officer History."  Doc. No. 30 (Ex. C. to Defendant's Reply in Support of Motion for Summary Judgment).

[34] McCauley Report at 12.

[35] *Id.* at 15-16.

[36] *Id.* at 16.

### D.  Procedural History

After Mr. McDaniels's death, Plaintiff filed suit against Officer Olivo in the Philadelphia Court of Common Pleas asserting state-law claims.  Plaintiff later amended the Complaint to add a § 1983 claim against the City of Philadelphia.  Defendants then removed the case to federal court, and Officer Olivo was dismissed by agreement of the parties, leaving only the § 1983 claim against the City, which now moves for summary judgment.

## II.   LEGAL STANDARD

### A.  Summary Judgment Standard

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37]  A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[38]  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[39]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[40] Further, "a court may not weigh the evidence or make credibility determinations."[41] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[42]  "If the evidence is merely colorable, or is not

---

[37] Fed. R. Civ. P. 56(a).

[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[39] *Id.*

[40] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[41] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[42] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

significantly probative, summary judgment may be granted."[43]  This requirement upholds the

"underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it

is unnecessary and would only cause delay and expense."[44]  Therefore, if, after making all

reasonable inferences in favor of the non-moving party, the court determines that there is no

genuine dispute as to any material fact, summary judgment is appropriate.[45]

### B.  *Monell* Liability Under § 1983

Plaintiff brings a claim under § 1983 alleging that Officer Olivo violated Mr.

McDaniels's right to be free from the unreasonable use of deadly force under the Fourth and

Fourteenth Amendments.  "[Section] 1983 provides remedies for deprivations of rights

established in the Constitution or federal laws," but "does not, by its own terms, create

substantive rights."[46]  Thus, as a threshold matter, Plaintiff must establish that Officer Olivo

violated Mr. McDaniels's constitutional right, which requires showing "that a 'seizure' occurred

and that it was unreasonable."[47]

There is no *respondeat superior* liability under § 1983,[48] so to hold the City liable for

Officer Olivo's actions, Plaintiff must also establish that Defendant maintained a policy or

custom which led to the constitutional injury.[49]  To do so, Plaintiff must:  "(1) identify a policy

or custom that deprived [Mr. McDaniels] of a federally protected right, (2) demonstrate that the

---

[43] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[44] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[45] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[46] *Torres v. City of Allentown*, No. 07-0934, 2008 WL 2600314, at *2 (E.D. Pa. June 30, 2008) (citations omitted).

[47] *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (citation omitted).

[48] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[49] *Berry v. City of Phila.*, 188 F. Supp. 3d 464, 474 (E.D. Pa. 2016) ("[I]n order to hold the city liable, she must prove that a municipal policy or custom caused the constitutional violation.") (citing *Berg v. Cty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000)).

municipality, by its deliberate conduct, acted as the 'moving force' behind the alleged deprivation, and (3) establish a direct causal link between the policy or custom and the plaintiff's injury."[50]

Plaintiff asserts two theories of § 1983 liability:  (1) that PPD failed to train Officer Olivo adequately regarding the use of deadly force; and (2) that PPD failed to discipline Officer Olivo adequately for previous violations of PPD policy.  Both theories are well established.[51]

For failure-to-train claims, liability attaches only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[52]  In addition, "a district court should impose liability only when the training *should* have been more thorough or comprehensive, not merely because municipal training *could* have been more thorough or comprehensive."[53]

Regarding failure-to-discipline claims, "a city may be liable for its failure to discipline an officer after multiple complaints against him, particularly where the prior conduct which the officer engaged in is similar to the conduct which forms the basis for the suit."[54]  In determining failure-to-discipline liability, "[i]t is not enough that an investigative process be in place;" rather, "[t]he investigative process must be real" and "have some teeth."[55]  For failure-to-discipline claims, as with failure-to-train claims, it is not enough for the plaintiff to establish merely that the disciplinary process was inadequate.  Rather, the plaintiff must show that the city's failure

---

[50] *Torres*, 2008 WL 2600314, at * 4 (internal quotation marks omitted) (citing *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

[51] *E.g.*, *Wnek v. City of Phila.*, Civil Action No. 05-cv-3065, 2007 WL 1410361, at *3 (E.D. Pa. May 11, 2007) ("Courts have recognized that municipal liability may arise where a police department has failed to train or discipline its officers.") (citations omitted).

[52] *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

[53] *Berrios v. City of Phila.*, 96 F. Supp. 3d 523, 536 (E.D. Pa. 2015) (quoting *City of Canton*, 489 U.S. at 392).

[54] *Wnek*, 2007 WL 1410361, at *3 (citations omitted).

[55] *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996)

amounted to "deliberate indifference to the rights of persons with whom the police come into contact."[56]  "Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."[57]

## III.   DISCUSSION

Defendant moves for summary judgment on the following grounds:  (1) Plaintiff cannot establish a constitutional violation by Officer Olivo; (2) Plaintiff has failed to offer competent evidence of liability under either a failure-to-train or failure-to-discipline theory; (3) Plaintiff cannot establish deliberate indifference on behalf of Police Commissioner Ramsey, the relevant policymaker here; and (4) Plaintiff cannot establish causation.  The Court will address each argument in turn.

### A.  Fourth Amendment Violation

The Court begins with the threshold question of whether Plaintiff can establish a constitutional violation.  It is well established that an officer's unreasonable use of deadly force may ground a claim for violation of a decedent's Fourth Amendment rights under § 1983.[58] Here, the parties agree that Officer Olivo killed Mr. McDaniels, and there is a genuine factual dispute regarding whether Officer Olivo's use of force was reasonable under the circumstances. The Court thus turns to the other requirements for Plaintiff's § 1983 claim.

### B.  *Monell* Liability

Defendant argues that Plaintiff cannot adduce competent evidence that PPD failed to train or discipline Officer Olivo.  The Court will address each theory of liability separately.

---

[56] *See id.* at 972 (citation omitted).

[57] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[58] *Tennessee v. Garner*, 471 U.S. 1 (1985).

## 1. Failure-to-Train

Recognizing that Plaintiff's failure-to-train theory rests upon Dr. McCauley's Report and the DOJ Report, Defendant launches a number of attacks on both, not one of which is persuasive.

### a. Dr. McCauley's Report

Defendant does not challenge Dr. McCauley's expert qualifications. Instead, Defendant's primary argument is that because Dr. McCauley's opinions have been criticized in other cases, they cannot be credited here,[59] which amounts to nothing more than a credibility attack that is inappropriate for summary judgment.[60]

Moreover, the cases cited by Defendant hardly amount to a wholesale rebuke of Dr. McCauley's opinions. Instead, these cases either did not address Dr. McCauley's report directly[61] or involved situations where the record as a whole was plainly insufficient to support a § 1983 claim.[62] Here, in contrast, Dr. McCauley's opinions are based, in part, on the DOJ

---

[59] Doc. No. 25 at 4-7.

[60] *See Miller ex rel. Miller v. Evenflo Co.*, Civil Action No. 3:09-108, 2011 WL 7037127, at *2 n.2 (W.D. Pa. Dec. 15, 2011) (rejecting "a challenge to the credibility of the opinion of Plaintiff's expert at the summary judgment stage"); *Donohoe v. Am. Isuzu Motors, Inc.*, 155 F.R.D. 515, 521 n.7 (M.D. Pa. 1994) (rejecting argument that plaintiff's expert was not credible due to opinions expert had provided in other cases on the ground that such credibility attacks were inappropriate at summary judgment).

[61] *Carswell v. Borough of Homestead*, 381 F.3d 235, 243-44 (3d Cir. 2004) (holding that officer was entitled to qualified immunity, an issue of law that could not be decided by reference to Dr. McCauley's opinion).

[62] *Palm v. Las Vegas Metro. Police Dep't*, No. 97-15896, 1998 WL 196727, at *2 (9th Cir. 1998) (unpublished opinion) (affirming grant of summary judgment and finding that Dr. McCauley's opinion did not create a triable issue of fact regarding whether officer used unreasonable force in shooting plaintiff's son where uncontroverted eyewitness testimony established that decedent had just committed a rape and was lunging toward officer at time of shooting). Most of the other cases cited by Defendant similarly involve factual records so inadequate that Dr. McCauley's opinion alone was insufficient to establish liability. *See Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 325-26 (3d Cir. 2005) (affirming grant of summary judgment for municipality on failure-to-train claim involving jailhouse suicide because Dr. McCauley did not suggest any specific training methods that might have prevented the suicide and there was no other evidence of a failure to train); *Taylor v. Moletsky*, Civil Action No. 07-4883, 2010 WL 299747, at *8-9 (E.D. Pa. Jan. 22, 2010) (granting summary judgment on *Monell* claim where plaintiff was struck by a police car because plaintiff could not identify any other instance where a similar harm occurred and therefore could not establish that his injuries were caused by a municipal policy or custom); *Small v. City of Phila.*, Civil Action No. 05-5291, 2007 WL 674629, at *10-11 (E.D. Pa. Feb. 26, 2007) (finding Dr. McCauley's opinion that PPD failed to train officers on the execution of high-risk arrest warrants was insufficient to survive a summary judgment motion because Dr. McCauley's report focused only on the incident in question and there was no evidence that PPD's training practices as a whole were inadequate); *Henderson v. City of Phila.*, Civil Action No. 98-3861,

Report, which found widespread deficiencies in PPD's training practices.[63]  Courts in other
§ 1983 cases have relied upon Dr. McCauley's opinions regarding police practices in denying
summary judgment motions, and the Court cannot conclude that doing so here would be
improper simply because Dr. McCauley's findings were not accepted in other, factually
distinguishable, cases.[64]

Next, Defendant identifies six areas of Dr. McCauley's report that it believes are either
conclusory or unsupported by the record.  Defendant's unsubstantiated quarrels with Dr.
McCauley go only to the weight of his opinions, however, and are insufficient to carry
Defendant's burden at summary judgment.[65]  They are also unconvincing.

First, Defendant criticizes Dr. McCauley's focus on partner splitting, arguing that such
tactical decisions are irrelevant to whether Officer Olivo's use of deadly force was
unreasonable.[66]  But Dr. McCauley's opinion is not that partner splitting rendered Officer

---

1999 WL 482305, at *22 (E.D. Pa. July 12, 1999) (granting summary judgment on *Monell* claim that PPD's failure
to train officers regarding involuntary confinement procedures caused plaintiff's schizophrenic son to jump out of a
second-floor window because there was no evidence that the son's injuries could have been prevented through
superior training).

[63] *See* McCauley Report at 4-6 (listing materials reviewed), 18-22 (discussing DOJ Report), 22-24 (discussing IAO
Report).

[64] *See Lyons v. City of Phila.*, Civil Action No. 06-5195, 2007 WL 3018945, at *8-9 (E.D. Pa. Oct. 12, 2007)
(finding that Dr. McCauley's report and other record evidence created a triable issue of fact as to whether PPD's
deficient investigative process caused plaintiff officer's injuries during a physical altercation with another officer,
who had numerous red flags including off-duty criminal charges); *see also Doswell v. City of Pittsburgh*, Civil
Action No. 07-0761, 2009 WL 1734199, at *12-13 (W.D. Pa. June 16, 2009) (denying summary judgment on claim
that the Pittsburgh Police Department failed to train and supervise its employees based in part on Dr. McCauley's
opinion that the department's internal investigation practices were deficient); *Williams v. Twp. of W. Deptford*, Civil
Action No. 05-1805, 2008 WL 1809134, at *11 (D.N.J. Apr. 22, 2008) (denying municipality's motion for summary
judgment in part due to Dr. McCauley's opinion that police department's procedures for investigating complaints of
excessive force were inadequate).

[65] *Fed. Labs., Inc. v. Barringer Research Ltd.*, 696 F.2d 271, 274 (3d Cir. 1982) (on summary judgment, a court is
not "at liberty to disbelieve the good faith statements of experts . . . presented by the non-moving party") (citations
omitted).  *Cf. Walker v. Jacques*, Civil No. 04-351 (RMB), 2007 WL 2122028, at *6 n.7 (D.N.J. July 23, 2007)
(identifying portions of expert's opinion as conclusory but determining that such problems constituted "an issue of
credibility more appropriately left to the province of the jury").

[66] Doc. No. 25 at 8.

Olivo's ultimate use of force unreasonable, but that partner splitting is a dangerous tactic that stems from flawed PPD training programs and, here, placed Officer Olivo in a position where he was more likely to use deadly force against an unarmed civilian.[67]  Thus, partner splitting may be relevant to the extent it shows that PPD failed to train Officer Olivo, and that this training failure caused Mr. McDaniels's death.[68]

Second, Defendant argues that Dr. McCauley has no basis to criticize IAD's investigation into Mr. McDaniels's death.[69]  However, Dr. McCauley based his criticism on the record of the investigation, which showed that IAD did not address alleged tactical failures such as partner splitting, accepted Officer Olivo's version of events over independent eyewitness accounts, and ignored evidence from the Medical Examiner.[70]  Dr. McCauley also found that IAD did not account for Officer Olivo's two previous shootings when investigating Mr. McDaniels's death— a potentially serious omission, given that it is exceedingly rare for officers to be involved in more than one shooting.[71]  All of this could lead a reasonable factfinder to conclude that IAD's

---

[67] In another variation on its "partner splitting" argument, Defendant argues that Dr. McCauley's opinion on this point is irrelevant because "it was Officer Olivo's partner who split and ran . . . not Officer Olivo."  Doc. No. 25 at 8.  But Plaintiff's sole remaining claim is for municipal liability, not personal liability against Officer Olivo, so it is hardly dispositive that it was Officer Camarote who "split and ran," as that decision still may have resulted from deficient PPD training practices, and the effect was that Officer Olivo was alone with Mr. McDaniels.

[68] *See Jones v. City of Phila.*, Civil Action No. 08-3336, 2011 WL 710212, at *4-5 (E.D. Pa. Feb. 25, 2011) (denying summary judgment on *Monell* claim where plaintiff alleged that officer fatally shot individual after engaging in partner splitting, and concluding that "a reasonable jury could find that the City's failure to adopt a 'partner splitting' and 'foot pursuit' policy . . . rendered [the officer] unequipped to properly handle the incident in question and thereby 'caused' the alleged constitutional violation.") (citation omitted); *Pelzer v. City of Phila.*, 656 F. Supp. 2d 517, 532 (E.D. Pa. 2009) (denying summary judgment on *Monell* claim because there was evidence that PPD failed to train its officers adequately concerning pursuit of suspects, including by not training them regarding partner splitting).  Despite the existence of these two cases—both of which involved the City—Defendant's counsel maintains that he is aware of "no precedential case law in either the 3rd Circuit or any other Federal Circuit which holds that the tactical decision to partner split by an officer is a factor to be used in analyzing the reasonableness of an officers' use of force."  Doc. No. 25 at 8.

[69] Doc. No. 25 at 8-9.

[70] McCauley Report at 12.

[71] *Id.* at 13-15.

investigation into Mr. McDaniels's death was flawed in ways that were symptomatic of broader problems in PPD's disciplinary process, as Dr. McCauley did.[72]

Third, Defendant argues that Dr. McCauley erred by focusing on IAD's investigation of Officer Olivo after Mr. McDaniels's death, because any deficiencies in an *ex post* investigation cannot have contributed to Mr. McDaniels's death.[73]  But Dr. McCauley does not opine (and Plaintiff obviously does not argue) that the post-shooting investigation *caused* Mr. McDaniels's death, but rather that his death could have been avoided if Officer Olivo had been identified as a problem officer prior to the shooting.[74]

Fourth, Defendant argues that Dr. McCauley's opinion is predicated upon "outdated audit reports,"[75] but Dr. McCauley also based his opinion on the 2015 DOJ Report, a 2009 *Use of Force Assessment* conducted by the Police Executive Research Forum, and a "Police Shooting Spreadsheet" produced by PPD that included details on 1,509 shootings and the corresponding IAD investigations between 2003-2014, all of which can hardly be described as outdated.[76]  And the 2003 IAO Report, which Dr. McCauley reviewed, found that IAD's deficiencies were deep-rooted and resistant to change, so Dr. McCauley's opinion that similar problems remain is not so far-fetched as to warrant summary judgment.[77]

---

[72] Defendant also claims that a review of the IAD investigations alone is inadequate because no depositions of City officials were taken, Doc. No. 25 at 9, but there is no requirement that an expert rely on all possible sources of evidence, and the lack of deposition testimony on this subject goes, at most, to Dr. McCauley's credibility.

[73] Doc. No. 25 at 9.

[74] *See Beck*, 89 F.3d at 974-75 (holding that pattern of complaints against an officer could establish that police department knew officer was likely to act unreasonably and therefore ground a § 1983 claim).

[75] Doc. No. 25 at 9.

[76] McCauley Report at 17-21, 23-24, 27-34.

[77] IAO Report at 4 ("[T]he conditions necessary for meaningful and lasting reforms do not exist in the Department.").

Fifth, Defendant argues that Dr. McCauley erred by reviewing all Complaints Against Police ("CAPs") between 2003-2014, including those involving physical abuse and harassment, rather than focusing only on shooting incidents.[78]  But Dr. McCauley cited the CAPs report to show that IAD sustained only 3.3% of all complaints, and only 1% of complaints involving physical abuse, during that period—a rate below the expected range of 10-13% that Dr. McCauley opines is typical of police departments.[79]  That IAD sustains complaints at below the expected rate may evidence overall failures or biases in PPD's disciplinary system and thus may support Dr. McCauley's opinion.

Finally, Defendant argues that Dr. McCauley's audit of shooting investigations—one per year from 2003-2014—fails to reveal a pattern of unreasonable use of deadly force.[80]  However, Dr. McCauley reached the opposite conclusion and determined that these incidents made it "abundantly clear the PPD systematically fails to address critically important factors, including tactics threat assessment, and de-escalation when investigating police misconduct."[81]  While Defendant may not agree, the issue of whether Dr. McCauley's assessment is reasonable is a factual dispute for the jury, not grounds for summary judgment.[82]

### b.  The DOJ Report

Rather than offering evidence that disputes the conclusions of the DOJ Report, Defendant argues that the Report is inadmissible because:  (1) it contains hearsay; (2) it contains expert

---

[78] Doc. No. 25 at 9.

[79] McCauley Report at 25-26.

[80] Doc. No. 25 at 9-10.

[81] McCauley Report at 34.

[82] *Cf. Owens v. City of Phila.*, 6 F. Supp. 2d 373, 293 (E.D. Pa. 1998) (denying defendant's motion for summary judgment on § 1983 claim because plaintiff presented unrebutted expert testimony that, combined with the facts in the record, would allow factfinder to conclude that the defendant had failed to train corrections officers regarding suicide prevention).

testimony that does not comport with Federal Rule of Evidence 702; and (3) it is a subsequent remedial measure barred by Federal Rule of Evidence 407.[83]  None of these arguments is compelling and, in fact, similar challenges to the DOJ Report have been rejected by other courts in this District.[84]  The Court will briefly retread this ground here.

### i.    The DOJ Report Is Admissible as a Public Report Under Rule 803(8)

In general, an out-of-court statement offered for the truth of the matter asserted constitutes hearsay and is inadmissible.[85]  However, Rule 803(8) contains an exception for "factual findings from a legally authorized investigation" in a civil case so long as "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."[86]  The DOJ Report satisfies these criteria—it contains factual findings from an investigation carried out by the DOJ at PPD's request, and Defendant has not suggested that it lacks trustworthiness.[87]  While Defendant argues that portions of the Report are inadmissible because they reference statements of PPD officers and thus contain hearsay within hearsay, this is not true of the Report's conclusions and recommendations, which are factual findings and thus admissible under Rule 803(8).[88]

---

[83] Under Federal Rule of Civil Procedure 56(c)(2), at summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

[84] *See Berry*, 188 F. Supp. 3d at 475 (denying summary judgment motion and noting that "both [other] courts in this District that have addressed this DOJ Report in the context of summary judgment motions on § 1983 *Monell* claims have similarly denied the defendants' motions); *Valdez v. City of Phila.*, Civ. A. No. 12-7168, 2016 WL 2646667, at *4 (E.D. Pa. May 10, 2016) (similar); *Coyett v. City of Phila.*, 150 F. Supp. 3d 479 (E.D. Pa. 2015) (similar).

[85] Fed. R. Evid. 801, 802

[86] Fed. R. Evid. 803(8)(A)(iii)-(B).

[87] *See Valdez*, 2016 WL 2646667, at *3.

[88] *E.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (holding that portions of public reports stating conclusions or opinions constitute "factual findings" within the meaning of Rule 803(8) and are admissible as such).

There are two other problems with Defendant's hearsay argument.  First, it is not clear that statements by PPD Officers in the DOJ Report are hearsay at all, as they may constitute statements by an opposing party's agent or employee under Fed. R. Evid. 801(d)(2)(D).  Second, even if statements within the DOJ Report are inadmissible as

ii.   **The DOJ Report Is Not Expert Opinion Subject to Rule 702**

Defendant next argues that the DOJ Report is inadmissible because it does not meet Rule 702's requirements for expert testimony.[89]  However, the premise of this argument—that the DOJ Report contains expert opinions subject to Rule 702—is misplaced because the Report is not offered as expert testimony, and merely contains factual findings made by the DOJ at PPD's request.  There is no requirement that a public report admissible under Rule 803(8) must also satisfy Rule 702,[90] and the DOJ Report is therefore properly before the Court.[91]

iii.   **The DOJ Report Is Not a Subsequent Remedial Measure Barred By Rule 407**

Finally, Defendant argues that the DOJ Report is inadmissible under Rule 407, which provides:  "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct."  However, the DOJ Report does not constitute an improvement in PPD's practices that would be barred by Rule 407 because it contains only recommendations, not actual remedial measures.[92]  Defendant nonetheless claims that public policy requires the Court to ignore the DOJ Report

---

hearsay within hearsay, Dr. McCauley is still likely able to rely upon them in forming his expert opinions, as he did here.  *See* Fed. R. Evid. 703.

[89] Doc. No. 25 at 11 (citing *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 592-593 (1993)).

[90] *Clark v. Clabaugh*, 20 F.3d 1290, 1294-95 (3d Cir. 1994) ("Rule 803(8) does not on its face require that the one who undertakes the investigation and authors the report be qualified as an expert before the report becomes admissible, as the defendants contend.").

[91] *Valdez*, 2016 WL 2646667, at *4 (rejecting argument that DOJ Report was inadmissible under Rule 702).

[92] *Id.* at *4 ("The Report itself does not contain any measures that would have made [an] alleged violation any less likely to occur; only the Philadelphia Police Department's decisions to implement those recommendations would have done so.  Instead, the Report is more appropriately viewed as a sort of 'step zero'— providing facts, data, and conclusions that would guide future policy decisions, but not the policy decisions themselves."); *see also Coyett*, 150 F. Supp. 3d at 482 n.5 ("The [DOJ Report] is not a 'subsequent remedial measure' as articulated in Rule 407.").

Defendant cites *Kelly v. Las Vegas Metropolitan Police Department*, No. 2:12–cv–02074–LRH–CWH, 2014 WL 3725927, at *11 (D. Nev. July 25, 2014) in support of its position, and while it is true that the court in that case found a similar DOJ report inadmissible under Rule 407, the court also found the report irrelevant and, in any event, this decision is not binding on the Court.

because "parties should not be penalized for looking at ways to improve their processes, policies, or products."[93]  That logic is backwards, however, because it would allow parties to escape liability merely for speculating about ways to improve their practices without actually doing so. That is why Rule 407's prohibition extends only to evidence of remedial measures that "are taken," not those that are merely hypothetical.[94]

In short, none of Defendant's arguments warrants disregarding the DOJ Report on summary judgment, and the Court concludes that it, combined with Dr. McCauley's testimony, creates a genuine issue of material fact regarding whether PPD failed to train its officers adequately.

### 2.  Failure-to-Discipline

Regarding failure-to-discipline liability, Defendant argues that Plaintiff has failed to adduce sufficient evidence to bring this theory to a jury because:  (1) IAD adequately investigated Officer Olivo after his two prior shooting incidents; and (2) PPD's disciplinary policies have been found to be sufficient in other cases.  Neither argument is persuasive.

Defendant's first argument amounts to little more than an assertion that IAD adequately investigated Officer Olivo prior to the shooting of Mr. McDaniels, which cannot satisfy Defendant's burden at summary judgment.[95]  As explained, Plaintiff has put forward expert

---

[93] Doc. No. 25 at 12.

[94] *See* CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 4:50 (2016) ("Rule 407 does not apply to investigative reports, or post-accident inspections that reflect the condition of the machine or instrumentality in question or analyze the cause or reasons for an accident.  The reason is that such reports or inspections are not themselves remedial measures, and do not themselves even reflect decisions to take or implement such measures.").

[95] *Celotex*, 477 U.S. at 328 (White, J., concurring) ("It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.").

opinion that these prior investigations were inadequate, which is enough to create a genuine dispute regarding the sufficiency of IAD's processes.

Defendant also suggests that Officer Olivo's history of complaints is insufficient to ground a failure-to-discipline claim as a matter of law, relying on the Third Circuit's decision in *Beck v. City of Pittsburgh*.[96]   In *Beck*, the plaintiff brought a failure-to-discipline claim alleging excessive force by a Pittsburgh police officer, and presented evidence at trial that the officer had incurred five excessive-force complaints prior to the incident in question and that the police department's internal investigation system was structurally flawed.[97]   The trial court nonetheless granted judgment as a matter of law in favor of the defendant, finding that the mere fact the department had investigated plaintiff's complaint barred plaintiff's claim.[98]   The Third Circuit reversed, explaining that the officer's prior complaints, combined with the evidence that the department's investigative process was lacking, was sufficient to bring the case to the jury.[99]

Many of the salient facts from *Beck* are present here.  Like the officer in *Beck*, Officer Olivo had a history of disciplinary complaints, and Dr. McCauley found that IAD failed to investigate these incidents properly, including by ignoring evidence that Officer Olivo had violated PPD policy in both prior incidents.[100]   And like the investigative process in *Beck*,[101] Dr. McCauley found that IAD investigations were deficient because they evaluated incidents in a vacuum, rather than taking past infractions into account, and were suspect in general because

---

[96] 89 F.3d 966 (3d Cir. 1996).

[97] *Id.* at 972-974.

[98] *Id.* at 970.

[99] *Id.* at 973-74.

[100] McCauley Report at 12-16.

[101] *Beck*, 89 F.3d at 973 (noting that "under the sterile and shallow . . . system of investigation, each complaint was insulated from other prior and similar complaints and treated in a vacuum").

they routinely failed to sustain complaints, even against repeat offenders such as Officer

Olivo.[102]  *Beck* thus does not foreclose Plaintiff's claim.

Defendant's second argument—that IAD's disciplinary practices have been found

sufficient in other cases—is based upon two cases from this District, neither of which stands for

the proposition that IAD's practices are adequate as a matter of law.  In *Glass v. City of

Philadelphia*, the court found that the plaintiffs did not establish that IAD's investigation

practices were deficient at trial, but in that case the plaintiffs "did not present any evidence that

the IAD investigation process was flawed other than [one of the plaintiff's] own allegations."[103]

And Defendant's reliance upon *Whichard v. Cheltenham Township* is simply bizarre, as in that

case (which did not involve PPD at all) the court denied the defendant's motion for summary

judgment on a failure-to-discipline claim, finding that a genuine issue of material fact existed

regarding the sufficiency of the defendant's internal investigation practices.[104]

In short, Plaintiff has put forward sufficient evidence to create a genuine issue of material

fact regarding whether PPD's disciplinary processes were adequate.

### C.  Deliberate Indifference

Defendant argues that Plaintiff cannot establish deliberate indifference because:  (1)

Plaintiff has not adduced evidence sufficient to show that the relevant decision-maker, former

Police Commissioner Ramsey, was deliberately indifferent; and (2) the mere existence of PPD

---

[102] McCauley Report at 17.  Defendant asserts that unlike the disciplinary system in *Beck*, IAD maintains an "Internal Affairs Case Management System" that provides officer "alerts" with respect to complaints, and therefore functions as a tracking system, Doc. No. 25 at 21, but cites no evidence regarding the existence or effect of this system.  Even taking Defendant at its word, Dr. McCauley's review of IAD investigations shows that any tracking system IAD had in place may not have been effective, creating a triable issue of fact.  Moreover, the DOJ Report found that PPD's early intervention systems "remain largely untested and unverified."  DOJ Report at 108.

[103] 455 F. Supp. 2d 302, 344 (E.D. Pa. 2006).

[104] Civ. A. No. 95-3969, 1996 WL 502281, at *6 (E.D. Pa. Aug. 29, 1996) ("The Court is satisfied that Plaintiff has come forward with evidence upon which a reasonable juror could conclude that the Township's internal investigation procedures are inadequate by today's professional standards.").

training programs regarding the use of deadly force precludes a finding of deliberate indifference.  Similar arguments have already been rejected in other cases in this District, and they fail here as well.

### 1. A Genuine Issue of Material Fact Exists Regarding Whether Defendant Was Deliberately Indifferent

First, Defendant argues that Plaintiff has failed to put forward evidence of deliberate indifference.  In order to establish deliberate indifference, Plaintiff must show:  "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[105]  Typically, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[106]  However, in the context of the use of deadly force by police, the Supreme Court has stated that the need for sufficient training is "so obvious, that failure to do so" itself can "properly be characterized as deliberate indifference to constitutional rights."[107]

Here, it is beyond peradventure that PPD policymakers "knew that officers would confront situations where they would have to determine whether to use deadly force, and that the wrong choice was likely to lead to a constitutional violation."[108]  And there is also evidence that PPD officers had a history of inappropriately resorting to deadly force, because the DOJ Report

---

[105] *Coyett*, 150 F. Supp. at 485-86 (quoting *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)).

[106] *Thomas v. Cumberland Cty.*, 749 F.3d 217, 233 (3d Cir. 2014) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)).

[107] *City of Canton*, 489 U.S. at 390 n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons . . . . Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.").

[108] *Berry*, 188 F. Supp. 3d at 475.

found that the number of shootings by PPD officers rose between 2007 and 2014, and that approximately 15% of these shootings involved unarmed suspects.[109]  Indeed, this trend was alarming enough that Commissioner Ramsey requested the DOJ's assistance.  All of this could lead a reasonable factfinder to conclude that PPD policymakers were deliberately indifferent to a pattern of violations of constitutional rights, as three other courts in this District have found.[110]

Defendant nonetheless argues that the DOJ Report cannot show deliberate indifference because it only suggests "best practices" but does not indict current PPD practices.[111]  This creative reading of the DOJ Report ignores many of its conclusions, such as that PPD officers did "not regularly receive in-service training" on "threat perception, decision making, and de-escalation," and that PPD's policies sent confusing signals about when the use of deadly force was permissible.[112]  A reasonable jury could conclude from this that PPD's training programs did not merely have room for improvement, but reflected a deliberate indifference to widespread problems regarding the use of deadly force by PPD officers.

Defendant also argues there is no evidence that Commissioner Ramsey specifically was aware of any deficiencies in PPD's training programs and disciplinary system.  But there is no

---

[109] DOJ Report at 2, 33; *Berry*, 188 F. Supp. 3d at 475 (finding that PPD's knowledge of police shootings, as found by the DOJ Report, could establish deliberate indifference).

[110] *See Valdez*, 2016 WL 2646667, at *6 (finding that DOJ Report constituted sufficient "evidence of a lack of training in de-escalation tactics that a reasonable jury could determine that Defendant's failure to train constituted deliberate indifference on the Philadelphia Police Department's part"); *Berry*, 188 F. Supp. 3d at 475 (finding that the DOJ Report "could lead a reasonable jury to determine that the City of Philadelphia knew about a pattern of violations of constitutional rights and . . . was deliberately indifferent to the inadequacies of the PPD's deadly force training"); *Coyett*, 150 F. Supp. 3d at 487-88 (finding that DOJ Report, coupled with procedural failures evident in officer's disciplinary proceedings, suggested deliberate indifference).

[111] Doc. No. 25 at 14-15.

[112] DOJ Report at 5, 44-45.  In a somewhat different factual context, the Third Circuit has found that evidence of a lack of de-escalation training itself is sufficient to create a genuine issue of material fact regarding deliberate indifference.  *See Thomas*, 749 F.3d at 225-226 (holding, in context of failure-to-train claim concerning corrections officers, that evidence of a lack of de-escalation training was sufficient to establish deliberate indifference for summary judgment purposes).

requirement "that the responsible decisionmaker must be specifically identified by the plaintiff's evidence," and "[p]ractices so well-settled as to have the force of law are ascribable to municipal decisionmakers."[113]  Moreover, the Third Circuit has explained that "[a] reasonable fact-finder may conclude that a Police Chief has constructive knowledge of constitutional violations where they are repeatedly reported in writing to the Police Department."[114]  Here, Defendant does not seriously argue that Commissioner Ramsey was unaware of the spate of police shootings prior to Mr. McDaniels's death or dispute that PPD was on notice of potential problems with Officer Olivo through a series of written complaints.  Thus, there is a genuine issue of material fact regarding whether Commissioner Ramsey was deliberately indifferent to the inadequacies in PPD's training and disciplinary practices.[115]

### 2. The Mere Existence of a Training Program Does Not Insulate Defendant From Liability

Second, Defendant argues that the mere existence of PPD's training programs means that Plaintiff cannot establish deliberate indifference.[116]  This argument is meritless, as there is ample evidence that PPD policymakers were aware of serious deficiencies in PPD training programs. And the evidence Defendant points to in support of its position—a 2001 manual entitled "Use of Force in Law Enforcement" and a "Training Academy Syllabus"—is insufficient for summary judgment, as it simply shows that PPD officers were given written instructions regarding the use of force at some point, but does not call into question the findings in the DOJ Report or Dr. McCauley's opinions.[117]  In fact, Defendant's reliance on a 2001 written training manual arguably confirms some of the DOJ's criticisms, including that certain training consisted of

---

[113] *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citations and internal quotation marks omitted).

[114] *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 913 (3d Cir. 2003) (citation omitted).

[115] *E.g.*, *Berry*, 188 F. Supp. 3d at 475 (DOJ Report, combined with other evidence, established that the relevant policymaker was deliberately indifferent to inadequacies in PPD's training programs).

"little more than lecture and observation," and that PPD's use-of-force training practices were outdated.[118]

In short, Defendant has failed to establish that it is entitled to summary judgment on the issue of deliberate indifference.

### D. Causation

Finally, Defendant argues that Plaintiff cannot establish causation.[119]  To do so, Plaintiff must show that PPD's decisions were the "moving force behind an actual constitutional violation."[120]  In the context of a failure-to-train or supervise theory of liability, the causation inquiry focuses on whether "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect."[121]  In general, "[t]he question of causation should be left to a jury as long as the causal link is not too tenuous."[122]  And where, as here, the plaintiff's claim concerns police misconduct, if the defendant "is shown to have tolerated known misconduct by police officers," the issue of whether the defendant's inaction contributed to the alleged constitutional deprivation "is a question of fact for the jury."[123]

Here, as discussed, Plaintiff has put forward evidence that Mr. McDaniels's death would have been avoided had Officer Olivo either been trained properly regarding the use of deadly

---

[116] Doc. No. 25 at 17.

[117] Doc. No. 27 (Ex. A to Defendant's Reply in Support of Motion for Summary Judgment); Doc. No. 28 (Ex. B to Defendant's Reply in Support of Motion for Summary Judgment).

[118] DOJ Report at 69.

[119] Doc. No. 25 at 22.

[120] *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 125 (3d Cir. 2003) (quoting *City of Canton*, 489 U.S. at 389) (internal quotation marks omitted).

[121] *Thomas*, 749 F.3d at 226 (quoting *Canton*, 489 U.S. at 391).

[122] *Coyett*, 150 F. Supp. 3d at 486 (citation and internal quotation marks omitted).

[123] *Id.* (citation omitted).

force, or disciplined adequately for his previous shooting incidents.  The issue of causation will therefore be left to the jury.[124]

## IV.   CONCLUSION

For the reasons stated above, Defendants' motions will be denied.  An appropriate Order will be entered.

---

[124] *See Coyett*, 150 F. Supp. 3d at 488-89 (determining that the "question of causation—specifically, whether the City's custom of failing to provide adequate use of force training, or a suitable internal disciplinary process for its officers, was the 'moving force' behind [a police shooting]—is one best left for a jury resolution"); *see also Berry*, 188 F. Supp. 3d at 464 (finding that there was "sufficient evidence of a causal link between the PPD's training failures and [plaintiff's decedent's] death for [p]laintiff to defeat summary judgment").